IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| S. L., by and through her Next Friend, PAM LAKEY, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 08-3105-CV-S-ODS |
| SEYMOUR R-2 SCHOOL DISTRICT, et al., | ) ) ) | |
| Defendants/Third Party Plaintiffs, | ) ) | |
| vs. | ) ) | |
| MIKE LAKEY, | ) ) | |
| Third Party Defendant. | ) | |

## ORDER AND OPINION (1) GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND (2) DISMISSING REMAINING CLAIMS WITHOUT PREJUDICE

Pending is Defendant's Motion for Summary Judgment. For the following reasons, the motion is granted with respect to Plaintiff's constitutional claims. The remaining claims are dismissed without prejudice.

I. BACKGROUND

The Record reveals the following uncontroverted facts.[1] The Seymour R-2 School District ("the District") is a public school district in Missouri. The District's

---

[1] In many instances, the facts are deemed uncontroverted because they have been agreed to by both sides, and no citation to the Record is provided for these facts. In other instances, one party has disagreed with a minor, insignificant portion of an allegedly uncontroverted fact, and on that basis described the entire statement as controverted. The undisputed aspects of those statements have also been deemed uncontroverted.

administrators, teachers, and staff are required by state law to report suspected child abuse and neglect to the Missouri Division of Family Services ("DFS").

Plaintiff S.L. has been diagnosed with cerebral palsy, and has attended school in the District since she was three years old. At the time relevant to this lawsuit – November 2005 – S.L. was in the third grade. The District assigned a paraprofessional to serve as S.L.'s aide on a full-time basis during school, and from the time S.L. was in the first grade through at least the time relevant to this suit that aide was Defendant Orliena Young. Young also had a relationship with S.L. and her family outside of school: she lived next door to S.L. and her family, occasionally took S.L. to church, and had been invited to their home on many occasions.[2]

One of Young's duties was to help S.L. use the restroom. Due to her cerebral palsy, S.L. needed help using the facilities and cleaning herself after using them. To that end, Young was required to remove S.L.'s clothing, remain with S.L., help her clean up, and redress her. According to S.L.'s deposition testimony, this process did not embarrass her.

On the evening of November 3, 2005, S.L.'s father spanked S.L. on the buttocks as punishment for S.L. slapping her mother. The next day was a school day, and S.L. went to school. While performing her regular duties involved in assisting S.L. in the restroom, Young noticed what has been variously described by the parties as a bruise or mark. For ease of discussion, the Court will refer to it as a mark; its precise characteristics will be discussed later. For her part, Young believed the mark to be a bruise. Young discussed the mark's presence with S.L.. After finishing in the restroom, Young reported her observations to S.L.'s teacher, Leslie Penner. Penner directed Young to report her observations to the school counselor, Joyce Adams. After Young and Adams discussed the matter, S.L. was brought to either the principal's office or the nurse's office. Young, Adams, and the school nurse (Darla Gregory) were the only other people in the office. Affidavits from Young and Adams indicate S.L. was asked if

---

[2]The District usually changed the aide assigned to a child in need every year or, at most, every two years. S.L's parents thought so much of Young that they asked that she be allowed to remain S.L.'s aide beyond the time normally allowed by the District.

"she would mind showing . . . the bruise." Adams Affidavit, ¶ 6; Young Affidavit, ¶ 19.[3] S.L. indicated her assent, and Young assisted her. Adams asked S.L. how she got the bruise, and S.L. told her about the spanking she received the night before.[4]

Adams was concerned about the mark and reported it to the school's principal, Defendant Brenda Lawson. Lawson believed a report to DFS was required, but was concerned that S.L. would be embarrassed "if she had to show the bruising to others and thought that having [S.L.'s] aide, Ms. Young, take a photograph to document the bruising . . . would prevent [S.L.] from having to bare her buttocks to a stranger." Lawson Affidavit, ¶ 10. Young took S.L. into the special needs restroom (apparently, the restroom she usually used) and took two or three photographs.

Lawson met with S.L.'s parents on November 7, and Adams met with S.L.'s mother on November 9. On November 14, a report was made to DFS. The District's Superintendent, Defendant Frank Rowles, was notified of these events after the report to DFS was made.

The Court has viewed the pictures. While the Court is not the finder of fact, and while the pictures are open to some interpretation, what the pictures depict is ultimately undeniable. S.L.'s face is not depicted, and there is nothing in the photo to identifying her as the subject. All that is depicted is S.L.'s buttocks, and there is certainly a mark or discoloration or bruise on S.L.'s buttock. The mark is of indeterminate shape: it could be the imprint of an open hand, a shoe, an iron, or some other object. It is also the appropriate size to be a hand, a shoe, or an iron – and thus cannot be characterized as "small" or "insignificant." A person observing the mark would find it noticeable – and a person regularly charged with helping S.L. use the restroom certainly would.

Plaintiff, with her mother acting as next friend, has filed suit against the District, Lawson, Young, and Rowles. Counts I, II, V and VII allege the Defendants deprived

---

[3] Plaintiff contends this fact is disputed, but offers no record citation that would create a factual dispute.

[4] Plaintiff contends this fact is disputed and cites pages 10 and 11 of S.L.'s deposition. Nothing on those pages addresses this fact.

3

Plaintiff of her rights to (1) be secure in her person, (2) personal safety and freedom, (3) adequate care, (4) privileges and immunities, and (5) free speech, thereby violating the First, Fourth, Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the Constitution. Counts III and IV allege Lawson failed to train employees and was negligent, Count VI alleges Young was negligent, and Count VIII alleges Rowles failed to train employees. Count X is a request for punitive damages and does not assert an independent cause of action.[5]

## II. DISCUSSION

A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See generally Williams v. City of St. Louis, 783 F.2d 114, 115 (8th Cir. 1986). "[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Get Away Club, Inc. v. Coleman, 969 F.2d 664 (8th Cir. 1992). In applying this standard, the Court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588-89 (1986); Tyler v. Harper, 744 F.2d 653, 655 (8th Cir. 1984), cert. denied, 470 U.S. 1057 (1985). However, a party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of the . . . pleadings, but . . . by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

### A. Constitutional Violations

---

[5] Count IX, which alleged Rowles negligently hired or retained Young as an employee, was voluntarily dismissed by Plaintiff in her response to the summary judgment motion.

4

At the outset, the Court notes some difficulty in identifying the precise constitutional issues involved in this case.  Defendants have addressed the Fourth and Fourteenth Amendment issues in this case.  Plaintiff faults Defendants for not addressing her other claims and contends they must be allowed to proceed to trial.  The problem with Plaintiff's position is that her other claims do not make any sense.  Plaintiff has not suggested how Defendants' conduct implicated the First, Fifth, Sixth, Eighth or Ninth Amendments to the Constitution, and the Court does not see how these constitutional rights apply.  Plaintiff was not (1) prohibited from exercising her right to speak or exercise her religion, (2) denied the right to counsel in a situation where counsel is mandated, (3) punished, or (4) denied her right to be indicted by a grand jury.  The Court concludes these claims lack merit.

This leaves, then, the Fourth and Fourteenth Amendments.  Plaintiff focuses almost exclusively on the Fourth Amendment, but the Court will address both provisions because both could conceivably apply in this situation.

*1.  Fourth Amendment*

For nearly twenty-five years it has been understood that the Fourth Amendment applies to students in public schools.  New Jersey v. T.L.O., 469 U.S. 325, 333-34 (1985).  However, while "the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, what is reasonable depends on the context within which a search takes place."  Id. at 337.[6]  In this regard, the Supreme Court held

---

[6]The Court rejects Defendants' insinuation that a "strip search" is not a search within the meaning of the Fourth Amendment if its purpose is to investigate potential abuse or neglect.  There can be little doubt that removing a student's clothing to inspect the flesh beneath it qualifies as a search within the meaning of the Fourth Amendment, and this conclusion cannot be changed through the passage of a state statute declaring otherwise.  Whether these events qualifies as a "strip search" or "just a search" is irrelevant because the constitutional analysis is the same.  Moreover, Defendants attempt to gain more from the statute than was intended.  Section 167.166 addresses a school's authority to conduct what has been statutorily defined as a "strip search," and the statute excludes searches in the furtherance of abuse and neglect investigations

5

"that the school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject." Id. at 340. Thus, "the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." Id. at 341; see also Vernonia School Dist. v. Acton, 515 U.S. 646, 652-53 (1995) ("[W]hether a particular search meets the reasonableness standard is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." (quotation omitted)). This requires consideration of both the justification and the scope of the search, as well as all other attendant circumstances.

In this case, there is no suggestion of impropriety arising from Young's assistance to S.L. when S.L. was using the restroom. There is also no suggestion that during that proper endeavor Young was somehow prohibited from observing the mark on S.L.'s buttocks. The violations are alleged to have occurred later, when (1) S.L. was asked to display the mark for Young and Adams and (2) Young took S.L. back to the restroom and photographed the mark. Plaintiff compares these events to those in Safford Unified School Dist. No. 1 v. Redding, where a student was required to remove her clothing so she could be searched for prescription drugs. 129 S. Ct. 2633, 2638 (2009). The comparison is inappropriate because in Redding the school officials did not have a sufficient basis for believing the student had secreted prescription drugs underneath her clothing. Id. at 2639-41. This was critical because the Supreme Court deemed it necessary that there be at least "a moderate chance of finding evidence of wrongdoing." Id. at 2639. "In sum, what was missing from the suspected facts . . . was any indication of danger to the students from the power of the drugs or their quantity, and any reason to suppose that Savana was carrying pills in her underwear. We think that the combination of these deficiencies was fatal to finding the search reasonable." Id. at 2642-43. This case is readily distinguishable because, at the time of the two searches at issue, Young *knew* there was a mark on S.L.'s body and *knew* exactly what it looked like. There was no speculation or guesswork as to whether S.L.'s body

---

from that definition.

displayed evidence that might indicate abuse. The important interests of confirming whether a report of potential abuse was warranted, preserving evidence, and the overarching objective of protecting a child from abuse justified the examination in the principal's or nurse's office. The need to preserve evidence while minimizing trauma to the young girl justified the second search and the photographs. In this regard, the Court notes Young was present on both occasions (and the only one present on the second), which minimized the intrusiveness because S.L. was accustomed to being undressed and dressed by Young.[7]

Ultimately, Plaintiff suggests no additional facts that bear on the reasonableness of Defendants' actions. Plaintiff contends there was no basis for believing S.L. was the victim of abuse, and relies solely on page 16 of Lawson's deposition for support. However, all that Lawson said was that at a particular point in time (that is not specified on that page of the deposition) a determination of reasonable cause to call DFS had not been made. Plaintiff has not supplied page 15 of the deposition in order to allow the Court to determine what point in time is being referenced. Regardless, there is no evidence in the Record suggesting that any of the Defendants believed there was no abuse, yet searched S.L. anyhow, or that any of the Defendants believed there was no abuse.

The objective and undisputed facts, then, reveal the following: Young regularly (if not daily) assisted S.L. in using the restroom and therefore had occasion to undress and dress her. While performing these duties on November 4, 2005, Young saw a mark on S.L.'s buttocks that caused her concern that S.L. had been abused. She reported this fact to the school counselor. Young and the counselor asked S.L. to reveal the mark again. The counselor shared Young's concern, and the principal was advised. The fact that the mark was still present the day following the spanking further legitimized

---

[7]This should not be construed as suggesting S.L. has "less rights" because she has cerebral palsy and requires assistance to perform routine daily functions. This is not the Court's holding. However, Young's role in the searches is significant. Certainly, the analysis would be different if a stranger (or someone who S.L. was not accustomed to undressing her) was involved and Young was not.

Defendants' concerns. The principal directed that Young photograph the mark. Young took S.L. to the restroom, and while only the two were present photographed the mark. The photographs confirm that the mark – regardless of what caused it or whether it is technically qualifies as a bruise – is readily apparent as being some sort of injury. Under these circumstances, and in light of the justifications and scope of the search, Plaintiff's Fourth Amendment rights were not violated.

### 2. Fourteenth Amendment

"The standard for evaluating a substantive due process claim is whether the alleged behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Cavataio v. City of Bella Villa, 570 F.3d 1015, 1022 (8th Cir. 2009) (quotations and citations omitted). At the risk of understatement, the Court notes this is a very high standard. See County of Sacramento v. Lewis, 523 U.S. 833, 848-49 (1998). It is difficult to conclude that conduct determined to be "reasonable" under the Fourth Amendment can "shock the conscience" under the Fourteenth Amendment. Indeed, the justifications for Defendants' actions, the individuals who performed those actions, the nature of the intrusion, and the other attendant circumstances dictate holding, as a matter of law, that Defendants' conduct did not violate S.L.'s Fourteenth Amendment rights.

### 3. Conclusion

The Court concludes the undisputed facts in the record demonstrate Plaintiff's constitutional rights were not violated. This conclusion makes it unnecessary to address several of the parties' remaining arguments, including (1) whether the individuals were only sued in their official capacities, (2) whether Defendants acted under color of state law, and (3) whether a valid policy or custom exists that would subject the District to liability.

B.  Tort Claims

The Court had supplemental jurisdiction over these claims, so the Court has the discretion to dismiss them without prejudice.  28 U.S.C. § 1367(c)(3).  The Court is inclined to exercise its discretion to retain jurisdiction, largely to save S.L. from enduring another lawsuit.  However, the Court concludes dismissal is appropriate because of uncertainties in state law.

Missouri law grants immunity to those parties who are required to report suspicions of child abuse and neglect.  It also provides immunity if those individuals engage in certain investigatory acts.  Mo. Rev. Stat. § 210.135.  However, Missouri law is not clear as to the extent of that immunity.  Certainly, there can be no liability for reporting the suspected abuse – but this is all that is certain.  Compounding the confusion is the uncertainty over Plaintiff's precise theory of negligence.  Finally, while Missouri law provides immunity for taking photographs to document suspected abuse, it appears that immunity is extended only to those who do so in accordance with a statute requiring such photographs, and that provision only applies to staff members of medical institutions.  Mo. Rev. Stat. § 210.120.

Defendants also rely on official immunity.  Once again, Missouri law is not clear on this subject.  In 1996, the Eighth Circuit relied on a prior decision of the Missouri Supreme Court to hold that school teachers, principals, and superintendents are not entitled to official immunity for their negligent acts.  S.B.L. v. Evans, 80 F.3d 307, 310 (8th Cir. 1996) (citing Lehman v. Wansing, 624 S.W.2d 1 (Mo. 1981) (en banc)).  Defendants point out that several Missouri Court of Appeal decisions have bestowed official immunity on principals and superintendents, but the Eighth Circuit was aware of this seeming divergence and nonetheless adhered to Lehman, noting that none of the appellate cases permitting official immunity cited to or discussed the Missouri Supreme Court's decision.  Id. at 310.  None of the cases decided since S.B.L. have addressed or acknowledged Lehman.

On both of these issues, the Court could endeavor to discern the content of state law.  In a case in which jurisdiction existed, the Court would be obligated to do so.

9

However, in the absence of an independent basis for jurisdiction, the prudent course is to exercise the discretion available to dismiss and allow Missouri courts to decide these matters.

### III.  CONCLUSION

For these reasons, Defendants' Motion for Summary Judgment (Doc. # 63) is granted in part, and Defendants are granted judgment on Counts I, II, V, and VII.  Count IX is dismissed with prejudice at Plaintiff's request.  The remaining counts are dismissed without prejudice.
IT IS SO ORDERED.

                                            /s/ Ortrie D. Smith
                                            ORTRIE D. SMITH, JUDGE
DATE: October 14, 2009               UNITED STATES DISTRICT COURT